**RETAINED REALTY, INC., Plaintiff,**

v.

**The Estate of Jack J. SPITZER, et al., Defendants.**

**Civil Action No. 3:06–CV–0493 (JCH).**

United States District Court,
D. Connecticut.

May 19, 2009.

Robert A. Ziegler, Leslee B. Hill, Law Offices of Robert A. Ziegler, Plainville, CT, Gerald L. Garlick, Katherine Elizabeth Abel, Linda Clifford Hadley, Krasow, Garlick & Hadley LLC, Hartford, CT, for Plaintiff.

Kate McCabe, Branford, CT, pro se.

Steven J. Defrank, Levy, Leff & Defrank, Joshua W. Cohen, Day Pitney LLP, New Haven, CT, Thomas A. Kaelin, Woodbury, CT, David M. Bernard, Erik H. Beard, James J. Tancredi, Michael P. Shea, Day Pitney LLP, Hartford, CT, for Defendants.

**RULING RE: DEFENDANTS' MOTION FOR ATTORNEYS' FEES (Doc. No. 177)**

JANET C. HALL, District Judge.

**I. INTRODUCTION**

Plaintiff Retained Realty, Inc. ("Retained") brought this action against The Estate of Jack Spitzer and its heirs, Charlotte Spitzer, Robert Spitzer and Jil Spitzer–Fox (collectively "The Estate"), seeking foreclosure on a property mortgaged by Jack Spitzer. In a Ruling dated April 10, 2007, 2007 WL 1089781, the court granted Retained's Motion for Summary Judgment and denied the Estate's Motion for Partial Summary Judgment. *See* Ruling (Doc. No. 87). The court subsequently entered a Judgment of Strict Foreclosure, pursuant to a Motion by Retained. *See* Judgment of Strict Foreclosure (Doc. No. 109).

Retained then made a Motion for a Deficiency Judgment pursuant to Conn. Gen. Stat. § 49–14 (Doc. No. 110). The Estate opposed the entry of a Deficiency Judgment on the grounds that Retained failed to provide notice of a claim against the Estate within the statute of limitations as required by Washington State's "non-claim statute," Wash. Rev.Code § 11.40.070. Because the Estate had raised this same issue in their Motion for Partial Summary Judgment, which was denied by the court, the Estate also moved the court for relief from that Order (Doc. No. 142) and renewed its Motion for Partial Summary Judgment on its Special Defense (Doc. No. 143).

In a Ruling dated September 12, 2008, the court concluded, after a re-review of Washington State case law interpreting Wash. Rev.Code § 11.40.070, that its initial Ruling (Doc. No. 87) on the issue of whether Washington law barred Retained's claim was incorrect, and that Retained's deficiency judgment claim was in fact barred. Accordingly, it granted the Estate's Motion for Partial Summary Judgment (Doc. No. 143), and denied Retained's Motion for a Deficiency Judgment (Doc. No. 110).[1] *See* Ruling (Doc. No. 172).

The Estate now makes a Motion for Attorneys' Fees pursuant to Conn. Gen. Stat. § 42–150bb (Doc. No. 177). Retained opposes this Motion. For the reasons stated below, defendants' Motion is

---

1. On September 30, 2007, the court also denied Retained's Motion to Amend/Reconsider the court's Ruling granting partial summary judgment to the Estate. *See* Ruling (Doc. No. 176).

GRANTED in Part and DENIED in Part.[2]

## II. STANDARD OF REVIEW

The "American Rule," which generally governs the payment of attorneys' fees in litigation in the United States, provides that each party to a case pays its own legal fees. Congress and state legislatures, however, have enacted statutes that provide for a losing party to pay the attorney's fees of a prevailing party in certain circumstances. *See, e.g., Rizzo Pool Co. v. Del Grosso*, 240 Conn. 58, 72–73, 689 A.2d 1097 (1997).

The Estate seeks attorneys' fees under one such statute, Conn. Gen.Stat. § 42–150bb. The statute provides, in pertinent part, as follows:

> Attorney's fees in action based on consumer contract or lease. Whenever any contract or lease . . . to which a consumer is a party, provides for the attorney's fee of the commercial party to be paid by the consumer, an attorney's fee shall be awarded as a matter of law to the consumer who successfully prosecutes or defends an action or a counterclaim based upon the contract or lease. . . . The provisions of this section shall apply only to contracts or leases in which the money, property or service which is the subject of the transaction is primarily for personal, family or household purposes.

Conn. Gen.Stat. § 42–150bb. This statute was enacted in 1979 with the purpose of making bilateral, unilateral attorney's fees provisions in contracts between a "consumer" and a "commercial party." That is, where a contract provides for the award of attorney's fees solely to a prevailing commercial party, but not to a prevailing consumer, the statute seeks to level the field

between them. Determining if the statute applies requires courts to answer two specific questions: a) whether a particular contract falls within the purview of the statute; and b) whether the action or counterclaim at issue is based upon the contract or lease. The statute also raises a third question common to other statutes that provide for awards of attorneys' fees: whether and to what extent a party has "successfully prosecute[d] or defend[ed]."

If a party meets the statute's criteria for fees, "the court has no latitude to deny" an award of attorney's fees. *Rizzo Pool Co.*, 240 Conn. at 66, 689 A.2d 1097. If a court decides that an order of fees is warranted, it must determine the size of the fee, basing its determination "as far as practicable upon the terms governing the size of the fee for the commercial party." Conn. Gen. Stat. § 42–150bb.

## III. DISCUSSION

### A. *Does the Contract Fall Within the Purview of the Statute?*

Determining whether the contract falls within the purview of section 42–150bb requires analyzing: 1) if the money or property that was the subject of the transaction—here, a Mortgage and Note on real property—was "primarily for personal, family or household purposes;" 2) whether the party to the contract seeking an award of attorney's fees—Spitzer—is the "consumer"; and 3) if the contract "provides for the attorney's fee of the commercial party to be paid by the consumer." *See* Conn. Gen.Stat. § 42–150bb.

 First, as the Connecticut Supreme Court has explained, "[section] 42–150bb [is] specifically designated as treating attorney's fees in actions on consumer contracts . . . . [it] provide[s] a definition of

---

**2.** At the close of the evidentiary hearing, the court reserved judgment on admitting the Deposition of Kate McCabe (Pl.'s Ex. 27). The court admits the portions highlighted in the deposition transcript, as well as page 64, lines 15–17.

'consumer contract' as one in which 'the money, property or service that is the subject of the transaction is primarily for personal, family or household purposes.'" *Rizzo Pool Co.*, 240 Conn. at 71, 689 A.2d 1097. Accordingly, "[w]hen faced with a motion pursuant to § 42–150bb, a court must, therefore, determine whether the contract at issue is the type of contract for which attorney's fees may be recovered." *Tyler E. Lyman, Inc. v. Lodrini*, 78 Conn. App. 582, 587, 828 A.2d 676 (Conn.App.Ct. 2003).

■ Because they are not for "personal, family or household purposes," contracts involving the purchase and sale or mortgage of real property held for investment are not considered "consumer contracts." The case of *Lyman, Tyler, Inc. v. Lodrini*, No. 545124, 2004 WL 424261 (Conn.Super.Ct. Feb. 20, 2004) is illuminating. *Lodrini* involved a contract to list for sale 13.7 acres of undeveloped property. *Id.* at *2. Before he was foiled by zoning regulations, the defendant-seller had intended to use most of the property for commercial purposes. Though he also intended to locate a personal residence on the property, it would only have occupied a small portion of the overall property, and no residence was ever built. *Id.* at *2–3. Accordingly, the court found that, because the primary intended use of the property was commercial, the defendant-seller was not entitled to attorneys' fees under section 42–150bb. *Id.* at *3.

■ The Estate contends that Spitzer was a consumer who entered into the contract primarily for personal, family, or household purposes. Retained vigorously disputes this claim, contending that Spitzer procured this loan through misrepresenting his intention to reside in the subject premises, when in reality it was to enable his cousin to remain in her longtime residence. Retained argues that Spitzer, because he did not reside in the property, held it as an investment rather than for "personal, family, or household use." It argues that "family" cannot be read to encompass an adult niece[3] with whom Mr. Spitzer did not reside, and that "[n]either the Property itself nor the borrowed funds "were intended to serve *Spitzer's* personal, family or household needs." Mem. in Opp'n at 8 (emphasis in original).

The court disagrees with Retained's contentions and finds that this transaction was intended to serve Spitzer's "personal, family or household purposes." Citing language from zoning regulations and automobile insurance contracts, Retained argues that the term "family" applies only to members of one's household and, because McCabe was Spitzer's cousin, the transaction was clearly not for a "personal" or "household" purpose. Mem. in Opp'n at 9–10. But if that were true, it would make the terms "personal" and "family," in "personal, family or household," superfluous.

The meanings of "personal" and "family" are not as narrow as Retained suggests. The term "personal, family or household" appears in a number of federal and state consumer-protection statutes, including the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, and the Bankruptcy Code.[4] Reading the term as used

---

3. In their brief, Retained refers to McCabe as Spitzer's niece, while the Estate's Response to Plaintiff's Second Set of Requests to Admit refers to them as cousins. *See* Pl.'s Ex. 26, item 17. It appears that they were cousins.

4. *See* 11 U.S.C. § 101(9) (Bankruptcy) ("The term 'consumer debt' means debt incurred by an individual primarily for a personal, family, or household purpose."); 12 U.S.C. § 1464(c)(2)(D) (Federal Savings Associations) ("A Federal savings association may make loans for personal, family, or household purposes...."); 12 U.S.C. § 3806(d)(1) (Adjustable Rate Mortgage Caps) ("[T]he term 'creditor' means a person who regularly extends credit for personal, family, or household purposes...."); 12 U.S.C. § 4313(1) (Truth

across multiple statutes reveals that the term serves to distinguish between the consumers that Congress or state legislatures sought to protect, and the investors or commercial entities viewed as sufficiently sophisticated and powerful bargainers not to be in need of such protection.

Additionally, in describing certain amounts of property exempted from the bankruptcy estate, the Bankruptcy Code refers to goods "held primarily for the personal, family, or household use *of the debtor or a dependent of the debtor.*" *See* 11 U.S.C. § 522(d)(3) & (4) (emphasis added). The Bankruptcy Code's use of this extended version of the term further supports the notion that the term "personal, family, or household" is a legal term of art not inherently circumscribed in the way that Retained suggests. Had the Connecticut legislature wished to restrict the reach of its statute to contracts procured for the benefit of one's own household or dependents only, as opposed to consumer contracts more generally, it could have used limiting language akin to that in the Bankruptcy Code. Instead, the statute's lack of such language suggests that the term "personal, family or household" is a general means of distinguishing the consumer contracts the Connecticut legislature sought to protect, from the investment and commercial contracts it did not, and that whether one is a niece or cousin as opposed to a daughter or sister is not the determining factor in whether one falls within or outside the statute's coverage. *See also Rizzo Pool Co.*, 240 Conn. at 71, 689 A.2d 1097 ("[Section] 42–150bb [is] specifically designated as treating attorney's fees in actions on consumer contracts .... [it] provide[s] a definition of 'consumer contract' as one in which 'the money, property or service that is the subject of the transaction is primarily for personal, family or household purposes").

In the instant transaction, Spitzer was not like the defendants in *Lodrini,* who sought to develop property for commercial purposes. Nor did he buy the property as an investment. The admissions of Retained, as well as the undisputed testimony of Attorney William Cashman, which the court credits, confirms that Spitzer received no financial benefit from his transaction with McCabe. McCabe legally transferred her home to Spitzer so that Spitzer could procure a mortgage on the home in order to provide McCabe money with which to live and stay in the house. Spitzer's purpose was to help out a relative—a clearly "personal" purpose.

■ In support of its claim that Spitzer bought the property as an investment, Re-

in Savings Act) ("The term "account" means any account intended for use by and generally used by consumers primarily for personal, family, or household purposes that is offered by a depository institution into which a consumer deposits funds...."); 15 U.S.C. § 1602(h) (Truth in Lending Act) ("The adjective 'consumer,' used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes."); 15 U.S.C. § 1681 m(b)(1) (Fair Credit Reporting Act) ("Whenever credit for personal, family, or household purposes involving a consumer is denied ... the user of such information shall, within a reasonable period of time, upon the consumer's written request for the reasons for such adverse action received within sixty days after learning of such adverse action, disclose the nature of the information to the consumer."); 15 U.S.C. § 1692a(5) (Fair Debt Collection Practices Act) ("The term 'debt' means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.").

tained has sought to show that Jack Spitzer and Kate McCabe had a plan to subdivide the property and thereby extract more equity from the value of the property. However, neither the undisputed testimony of Cashman, nor exhibits admitted into evidence at the hearing, support Retained's claim that McCabe and Spitzer intended to subdivide the property at the time Spitzer procured the mortgage at issue in this case. Cashman testified that the sole purpose for the refinancing transaction was so that Spitzer could facilitate McCabe staying in her own home, and that he had no conversations with Jack Spitzer, prior to procuring the mortgage or otherwise, about any plans to subdivide the property. Cashman testified that McCabe was starting a business, and Spitzer and McCabe hoped that if the business was successful, it would provide her with sufficient financial capacity to procure a new mortgage in her own right; if so, Spitzer would transfer title back to McCabe. The documentary evidence confirms the testimony. For example, notes of Attorney Marv Strasburg, dated October 1, 2004, suggest that the initial agreement between Spitzer and McCabe was for McCabe to refinance the property in her own name once her business took off, and that because the business had not taken off, as of the time of the call, she was "[n]ow hoping to subdivide." *See* Pl.'s Ex. 14. A letter from Cashman to plaintiff's attorney, Robert Ziegler, dated August 5, 2005, notes that at that time—over a year after Spitzer's death and eighteen months after the mortgage closing—McCabe was "in the latter stages of determining whether she can subdivide the property." Pl.'s Ex. 22. There is no evidence that Spitzer and McCabe had a purpose, plan, or intention to subdivide the property at the time they procured the mortgage. The fact that McCabe, subsequent to procuring the mortgage at issue in this case, pursued a plan to subdivide the property in an effort to save her home, does not make Jack Spitzer's actions at the time of procuring the mortgage non-personal.

Furthermore, even if the subdivision plans had germinated and come to fruition before Spitzer's death, which they did not, it would not change the fact that Spitzer's primary purpose in engaging in the underlying mortgage transaction was to assist his financially strapped cousin. This case is therefore the mirror of *Lodrini*, insofar as the primary intent of Spitzer's transaction was to assist a relative, and the investment intent as embodied in the subdivision proposal at the time the mortgage was procured, if any, was unformed, speculative, and never came to pass. *Cf. Lodrini*, 2004 WL 424261, at *2–3 (holding that where the seller's primary purpose had been to develop the property for commercial purposes, the fact that the seller had a secondary purpose to locate a small residence on the property, which residence was never built, did not change the primary purpose such that the seller could be considered a consumer under section 42–150bb).

Finally, Retained contends that Spitzer misrepresented his intention to reside at the subject premises in order to induce Emigrant to enter the contract. Had Spitzer properly represented his intent, Retained argues, Emigrant would have issued him a mortgage on different and less favorable terms. Spitzer, acting through McCabe, pledged to live in the property, and it appears that he never did so. Spitzer's misrepresentation, however, does not alter his purpose in entering into the transaction.

The testimony and exhibits make clear that Spitzer did not procure a mortgage on the residential property for his own investment or commercial purposes. Instead, he acted as the proverbial "rich uncle" who put his credit rating and financial where-

withal behind the refinancing of the subject residential property so that McCabe, a family member who was having severe financial difficulties, could remain in the home where she had lived for many decades. The court concludes that the transaction clearly falls within the statute as a transaction for "personal" purposes, and the contract therefore qualifies as a "consumer contract" under the statute.

Second, it follows that Spitzer is the "consumer . . . party," and Emigrant is the "commercial party" in the contract, where Spitzer, an individual, was the mortgagor and obligor on the loan and Emigrant,[5] a bank, acted as mortgagee.

■ Third, it is undisputed that the Note and Mortgage both provide for the payment by the consumer—Spitzer—of a reasonable attorney's fee of the commercial party—Emigrant—should that party prevail in enforcement efforts. These efforts include the pursuit of a deficiency judgment under Conn. Gen.Stat. § 49–14.

Accordingly, the contract falls within the purview of the statute.

### B. *Is the Action at Issue Based Upon the Contract?*

■ The court must next determine whether the action successfully defended by Spitzer—that is, an action for a deficiency judgment on the Note under section 49–14—qualifies as an action "based upon the contract or lease."

■ Courts have held certain sorts of actions to be not "based upon the contract or lease" and accordingly, not eligible for attorneys' fees under section 42–150bb. One such situation is where a party to a contract prevails on a claim not because the opposing party breached the contract, but on other grounds. In *Anderson v. Latimer Point Management Corp.*, the plaintiff, Anderson, subleased his property

from the defendant, LPMC. 208 Conn. 256, 545 A.2d 525 (1988). Anderson successfully challenged certain actions of LPMC, including its imposition of certain assessments, and also prevailed on LPMC's counterclaim seeking an injunction requiring Anderson to remove vegetation, not plant further, and not add a second story to his house. *Id.* at 260, 545 A.2d 525. The trial court held for Anderson on the basis that the bylaws under which LPMC sought to impose assessments and regulate Anderson's behavior were "impermissibly vague and incapable of providing standards," and therefore contrary to Connecticut law. *Id.* at 258 n. 2, 261, 545 A.2d 525. The trial court concluded that, while the lease qualified as a consumer lease under section 42–150bb, the plaintiff successfully prosecuted and defended the action on the basis of the inadequate bylaws, "and not on considerations involving the sublease." *Id.* at 265–66, 545 A.2d 525. The Connecticut Supreme Court agreed with the trial court's conclusion that section 42–150bb did not apply because the successful prosecution and defense was not based upon the lease.

Another situation in which section 42–150bb does not apply is where federal law restricts the enforceability of a contract otherwise enforceable under state law. In *In re Sokolowski*, 205 F.3d 532 (2d Cir. 2000), a bankrupt debtor sought declaratory and injunctive relief against a creditor that sought to repossess the debtor's vehicle. The debtor prevailed, but the Second Circuit refused to award the debtor attorneys' fees under section 42–150bb on the grounds that "the litigated issues involve[d] not basic contract enforcement questions, but issues peculiar to federal bankruptcy law." *Id.* at 535 (internal quotation marks and citation omitted). The court did so, it explained, because "the

---

5. Retained Realty, Inc., the plaintiff in this action, is Emigrant's successor in interest.

question of the applicability of the bankruptcy laws to particular contracts is not a question of the enforceability of a contract but rather involves a unique, separate area of federal law." The court specifically acknowledged, though, that where state law provides the rule of decision, fees may be awarded if state law so provides. *See id.* at 535; *see also In re Guarnieri,* 297 B.R. 365, 370 (Bankr.D.Conn.2003).

■ On the other hand, in circumstances where defendants prevail by defending against the enforceability of a contract under *state law* consumer protection statutes, Connecticut courts have awarded attorneys' fees under section 42–150bb. For example, in *Tavarez v. Credit Acceptance Corp.,* the debtor sued his lender following repossession of his vehicle for defaulting on his auto loan, claiming violations of the Retail Installment Sales Financing Act (RISFA) and other state laws. No. CV 980582925, 2000 WL 1058184, at *2 (Conn.Super.Ct. July 10, 2000). The lender counterclaimed for a deficiency judgment. *Id.* The debtor, who proved a violation of RISFA, prevailed on the counterclaim on the grounds that a lender who violates RISFA may not recover a deficiency judgment; the court awarded the debtor attorneys' fees for, *inter alia,* successfully defending against the counterclaim for a deficiency judgment. *Id.* at *10. In *Condor Capital Corp. v. Michaud,* which involved similar facts to *Tavarez,* the creditor sued for a deficiency judgment and the defendant-debtor counterclaimed, alleging a violation of RISFA. No. CV 990588911S, 2000 WL 1161093 (Conn.Super.Ct. July 25, 2000). The court found that, due to violations of RISFA, the creditor could not recover a deficiency judgment. *Id.* at *10. The court granted the defendant-debtor judgment on his RISFA counterclaim and awarded him attorneys' fees under section 42–150bb on the grounds that he successfully defended the action for a deficiency judgment and

prosecuted his RISFA counterclaim. *Id.* at *14.

The court must decide which analogy is more compelling. Mechanically, Washington's non-claim statute operates in a manner akin to the Bankruptcy Code at issue in *Sokolowski.* The non-claim statute prevents Retained from enforcing its rights to collect a deficiency judgment under the agreed-upon terms of its contract, just as the "fresh start" policy of the Bankruptcy Code, 11 U.S.C. § 521(2), blocked the enforceability of a default-upon-filing provision in the loan contract in *Sokolowski.* *See Sokolowski,* 205 F.3d at 535. Yet it also operates in a similar manner to RISFA, at issue in *Tavarez* and *Michaud,* which blocks the creditor from enforcing the terms of the contract. Both the Bankruptcy Code and RISFA restrict the enforceability of otherwise valid contracts on public policy grounds—the Bankruptcy Code in order to advance its policy of giving debtors a fresh start, RISFA in order to advance its policy of ensuring that consumers incur and repay debts on fair terms.

Yet the source of law, and the status of that law, distinguish RISFA from the Bankruptcy Code. In *Sokolowski,* the court determined that the prevailing debtor could not collect attorneys' fees under the Connecticut state statute because the decision turned upon an issue "peculiar to federal bankruptcy law." *See* 205 F.3d at 535. The court explained that the question at issue was not one "of the enforceability of a contract but rather involve[d] a unique, separate area of federal law." *Id.* The *Sokolowski* court notes that, had state law governed the substantive issues involved, it would have looked to the state law attorneys' fees provision. *Id.* Cases interpreting *Sokolowski* have similarly emphasized this distinction in source of law. *See In re Gifford,* 256 B.R. 661, 663–64

(Bankr.D.Conn.2000) (holding that Conn. Gen.Stat. section 42–150bb was not preempted by the Bankruptcy Code because the court determined a state law issue); *Guarnieri,* 297 B.R. at 370 ("Attorney's fees may be recovered in bankruptcy under Section 42–150bb if Connecticut state law supplies the rule of decision for the resolution of the relevant issues."). Furthermore, as *Gifford* points out, under the Supremacy Clause, the Bankruptcy Code preempts inconsistent state laws to the extent of actual conflict. 256 B.R. at 664 (quoting *Butner v. United States,* 440 U.S. 48, 54 n. 9, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)). When a court addresses a conflict between two state laws, on the other hand, similar concerns of preemption do not arise.

The fact that this case implicates the laws of two different states makes no difference. Connecticut has a similar statute of limitations on claims against an estate, *see* Conn. Gen.Stat. § 45a–375; in both Washington and Connecticut these statutes serve an important state interest in the prompt and orderly disposition of estates. That interest is undermined if estates are forced to expend sums of money and time defending against claims and judgments that cannot be validly collected. As discussed, Connecticut courts have found section 42–150bb applicable in circumstances where a debtor successfully defends against the effort to collect a deficiency judgment purportedly due under a contract, regardless of whether the debtor prevails because the creditor violated the literal terms of the contract or because the contract was unenforceable due to another provision of state law, like RISFA. Connecticut has not carved out an exception to section 42–150bb for a successful defense of a deficiency judgment on the grounds that it was uncollectible due to the operation of section 45a–375, and the court sees no reason to make such an exception for the Washington non-claim statute. Ac-

cordingly, the court finds that the action at issue—the Estate's successful defense against Retained's effort to collect a deficiency judgment—is an action on the contract within the meaning of section 42–150bb.

### C. *To What Extent Has the Estate Prevailed?*

▮ The parties also dispute the extent to which the Estate has prevailed. The Estate contends that it is entitled to all fees expended in its defense against Retained's effort to collect a deficiency judgment. Even though it initially lost, it contends that, because it eventually prevailed in its litigating position, it should be entitled to fees for the entirety of its effort. Retained counters that, even if the court awards fees, any award should be limited to fees expended on the Estate's successful effort to get this court's initial Ruling overturned, and should not include fees expended in the Estate's initial, unsuccessful effort. Retained also appeals to the equities of the situation, contending that because, in effect, the Estate chose to litigate the issue a second time in seeking reconsideration, it would be unfair to require Retained to pay for the Estate's fees twice. Finally, Retained suggests that, even assuming the correctness of the Estate's litigating position, because the court incorrectly interpreted Washington's non-claim statute in its initial decision, it should not have to pay additional fees as a result. *See* Pl.'s Opp'n at 3 ("[E]ven assuming this Court correctly reversed its initial decision, it is inappropriate for under these circumstances to force Plaintiff to pay for the initial incorrect decision rendered by this Court.").

The Connecticut statute provides for an award of fees "to the consumer who successfully prosecutes or defends an action or a counterclaim based upon the contract

or lease." Conn. Gen.Stat. § 42–150bb. The court is not aware of Connecticut caselaw specifically addressing the question of whether a "successful" defense of an action includes fees for intermediate stages of a litigation in which a party was temporarily unsuccessful along the way to ultimate success. Caselaw construing other statutes that provide for attorneys fees, however, suggests that in such circumstances, the prevailing party's entitlement to attorneys' fees includes fees for the unsuccessful stage.[6] *See, e.g., Cabrales v. County of Los Angeles,* 935 F.2d 1050 (9th Cir.1991) ("[A] plaintiff who is unsuccessful at a stage of litigation that was a necessary step to her ultimate victory is entitled to attorney's fees even for the unsuccessful stage."); *Alizadeh v. Safeway Stores, Inc.,* 910 F.2d 234 (5th Cir.1990) (awarding attorneys' fees for the entire course of the litigation of a claim, including for time spent on an unsuccessful appeal, where the party ultimately prevailed on the merits of the litigation); *see also Hensley v. Eckerhart,* 461 U.S. 424, 430, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (quoting *Davis v. County of Los Angeles,* 8 Empl. Prac. Dec. (CCH) ¶ 9444 (C.D.Cal.1974)) ("[P]laintiffs' counsel are entitled to an award of fees for all time reasonably expended in pursuit of the ultimate result achieved in the same manner that an attorney traditionally is compensated by a fee-paying client for all time reasonably expended on a matter.").

The Connecticut statute further provides that "the size of the attorney's fee awarded to the consumer shall be based as far as practicable upon the terms governing the size of the fee for the commercial party." Conn. Gen.Stat. § 42–150bb. Had the sequence of events in this case been reversed—that is, had Retained initially lost but eventually prevailed on reconsideration in its efforts to obtain a deficiency judgment—it could have obtained, pursuant to the Note, an award of reasonable attorneys' fees against the Estate covering the entirety of its ultimately successful efforts to collect. That is the court's view, and it suspects Retained would have agreed. Thus, the statute's direction to courts regarding how to determine the size of the fee also militates in favor of awarding the Estate fees reasonably expended in the entirety of its defensive efforts against the claimed deficiency.

This court's interpretation of the plain language of the statute, and caselaw supporting entitlement of an ultimately successful party to attorney's fees for a necessary but unsuccessful stage, leads it to conclude that the Estate may collect fees for reasonable efforts expended throughout in pursuit of its ultimate victory on Retained's deficiency claim. This includes

---

**6.** The greatest wealth of caselaw, at least in the federal courts, interprets the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. This statute uses the term "prevailing party," while the Connecticut statute uses the terminology "successfully prosecutes or defends." Consequently, much of the relevant caselaw on the subject of attorney's fees interprets the meaning of "prevailing party." The court is not persuaded that there is a sufficient difference between these terms to warrant not relying on caselaw using the term "prevailing" as opposed to "successful." *See* 1 Robert L. Rossi, Attorneys' Fees § 6:8: "Prevailing" or "Successful" Party (2d ed.2002–2008) (referring to "prevailing party" and "successful party" as similar terms and using them interchangeably). Furthermore, Connecticut lower courts interpreting Conn. Gen.Stat. § 42–150bb have used the term "prevailing party" in referring to a successful party under that statute. *See, e.g., Figueroa v. FAH Redstone Ltd. Partnership,* No. CVN07022096, 2007 WL 4633547, at *3 (Conn.Super. Nov. 29, 2007); *State Street Bank and Trust Co. v. Knight,* No. CV030080718, 2003 WL 22133297, at *2 (Conn.Super. Aug. 26, 2003) (quoting legislative history); *Fraser v. ETA Ass'n, Inc.,* 41 Conn.Supp. 417, 420, 580 A.2d 94 (Conn.Super.1990).

the final, successful stage and intermediate stages integrally related to the achievement of the ultimately successful outcome of avoiding a deficiency judgment.

### D. What Fees Should Be Awarded?

■■■■ The court's determination that the Estate is entitled to collect fees covering the successful stages of the litigation and prior, integrally related stages, does not mean that the Estate is entitled to everything that it has requested. First, the Estate is not entitled to recover fees covering time expended in dealing with the foreclosure, an issue on which the Estate did not prevail.[7] Second, the statute explicitly provides that "the size of the attorney's fee awarded to the consumer shall be based as far as practicable upon the terms governing the size of the fee for the commercial party." Conn. Gen.Stat. § 42–150bb. Third, while the Connecticut statute makes an award of fees mandatory in cases in which it applies, it affords the court discretion to determine what constitutes a reasonable fee. See Rizzo Pool Co., 240 Conn. at 73–77, 689 A.2d 1097 (noting that the award of attorneys' fees is within the "sound discretion of the trial court," and requiring an "evidentiary showing of reasonableness" for recovery of attorneys' fees under section 42–150bb). Therefore, the court is required to make a reasonableness determination, awarding only that portion of the requested fees that the court determines to have been reasonably expended in pursuit of its ultimate victory.

■■ "Connecticut courts traditionally examine the factors enumerated in rule 1.5(a) of the Rules of Professional Conduct in calculating a reasonable attorney's fee award." Simms v. Chaisson, 277 Conn. 319, 332, 890 A.2d 548 (2006). These factors are:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) The likelihood, if made known to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) The fee customarily charged in the locality for similar legal services;

(4) The amount involved and the results obtained;

(5) The time limitations imposed by the client or by the circumstances;

(6) The nature and length of the professional relationship with the client;

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) Whether the fee is fixed or contingent.

Model Rules of Professional Conduct, Rule 1.5(a). The starting point for this determination is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. See Hensley, 461 U.S. at 433–34, 103 S.Ct. 1933. The court must exclude from its calculation hours not "reasonably expended." Id.

---

**7.** The Estate has argued that, because it did not contest the foreclosure, there would not have been litigation at all were it not for Retained's efforts to pursue a deficiency judgment. Thus, the Estate contends, time spent on all parts of the litigation should be recoverable. The court does not accept this argument, because in the court's view, Kate McCabe's effort to claim an equitable interest in the property also contributed to the need to

litigate the foreclosure aspect of the case. The court will, however, award the Estate a limited fraction of the fees expended in the early stages of the litigation in recognition of the fact that Retained's effort to collect a deficiency judgment, and the Estate's effort to defend against it, was an issue on which time and resources were reasonably expended from the inception of the litigation.

The court has reviewed each time entry submitted by the Estate in its 44–page chart. *See* Ex. 102. As to some entries, the court has decreased the time permitted or eliminated the entry entirely. *See* Ex. A to Ruling. The court has done so for several reasons and sometimes for combinations of these reasons. For each entry where it has made a reduction, the court has noted a code delineating the reason for the reduction. The meaning of these codes is as follows:

BB Bunched Billing

Where the chart features long time entries aggregating multiple items without indicating the allotment of time across the multiple items, the court has reduced the time to what it believes was reasonably spent in work on the deficiency judgment.

C Conferences

Where multiple attorneys have billed time for the same conference beyond what the court considers to be reasonable, the court has reduced the time.

CT Cannot Tell How It Relates

Where the court cannot determine how this entry related to the deficiency judgment, it has reduced or eliminated it accordingly. Such entries include when the entry refers to the Wachovia matter, when the listings are not clear, and when the listing is bunched or aggregated in a way that the court cannot determine the amount of time spent on the deficiency judgment.

ET Excessive Time

Where the court determines that excessive time was spent on a particular task, it has reduced the time.

FD Foreclosure Defense

In mixed entries involving time spent on the foreclosure defense and the deficiency judgment, where the court determines that too much time was allocated to the deficiency judgment rather than the foreclosure defense, it has reduced the time.

TB Too Many Billers

Where too many individuals have billed for the same event, or there are too many billers involved in a particular matter beyond what the court considers to be reasonable, it has reduced the time.

USD Usery Special Defense

Where time is attributable to the usery special defense, the court has disallowed the time.

Having addressed the hours that were reasonably incurred, the court turns to the hourly rate of $275 charged by Day Pitney. The court understands it to be a "blended rate," charged by every attorney. While characterized as a "courtesy" to Spitzer's son, an attorney himself, it appears to the court that it did not achieve a reduction from what the court views as reasonable rates for timekeepers on this matter. Looking at the three principal billers, Attorneys Tancredi and Bernard, and Paralegal Clancy–Boy, the court finds, based on their experience *and* the nature of the matters at issue in this case, that the total charges, at a reasonable rate, would be less than the flat rate ($275/hr) and paralegal rate ($170/hr).

As defense counsel noted in an earlier filing, this was "a nominally contested residential foreclosure typically managed by practitioners at rates substantially below $300/hr." Mem. in Support (Doc. No. 99–2), at 6. While counsel was referring there to the fee application related to Retained Realty obtaining a judgment of foreclosure in mid–2007, the issue covered by defendant's fee application was a confined one, involving a single Washington statute. There was no serious dispute concerning the relevant underlying facts.

While Attorney Tancredi currently charges over $500/hour, he does so primarily based on his experience as a bankruptcy litigator. The court knows of no single-family house foreclosure in which such a rate was found reasonable. Nothing about this case would justify it. While Ms. Clancy–Boy has some two decades of experience as a paralegal, the court views her rate of $170 as high in relation to the court's understanding of rates for litigation paralegals generally, and in connection with the nature of the work done in this case. Finally, under the "flat" rate, Attorney Bernard, a December 2004 law school graduate, was billed at $275/hour. As part of a "flat" rate, that could have been reasonable. However, in this case, Attorney Bernard is responsible for approximately 75% of attorney time. Use of the flat rate is unreasonable for him, and for the attorney billers in general.

The court, based on its knowledge of rates generally in Connecticut and in particular for foreclosure work, finds that Attorney Tancredi's reasonable hourly rate on this matter is $375/hour, Attorney Bernard's reasonable hourly rate is $210/hour, and Ms. Clancy–Boy's reasonable hourly rate is $140/hour.[8] Attorney Carson's rate, based on her having graduated in 2003 or 2004, is set at $210. Attorneys Anthony and Wang, as first year associates, are set at $190. Ms. Leaderman's rate, as a summer associate, is set at $150. Micklich, presumed to be a paralegal claimed at $170, is set at $140. The remaining attorney billers, whose time totals just over 20 hours, will be left at the "flat" rate of $275.

After reducing the billed time and billing rates for the reasons specified above, the court awards a total of $113,306.50 in fees, as follows:

8. Each of these rates are a blend of rates covering the several-year time period of billing.

| Timekeeper | Hourly Rate | Total Hours | Total Billed Amount |
|---|---|---|---|
| Anthony | $190 | 3.4 | $ 646.00 |
| Bayer | $ 95 | 0.9 | $ 85.50 |
| Beard | $275 | 6.1 | $ 1,677.50 |
| Bernard | $210 | 328.9 | $69,069.00 |
| Carson | $210 | 26.2 | $ 5,502.00 |
| Clancy–Boy | $140 | 59.9 | $ 8,386.00 |
| Cohen | $275 | 2.8 | $ 770.00 |
| Dumais | $275 | 9.9 | $ 2,722.50 |
| Krzanowski | $275 | 1.0 | $ 275.00 |
| Leaderman | $150 | 5.9 | $ 885.00 |
| Micklich | $140 | 1.5 | $ 210.00 |
| Rydel | $275 | 0.6 | $ 165.00 |
| Shea | $275 | 0.3 | $ 82.50 |
| Tancredi | $375 | 57.1 | $21,412.50 |
| Wang | $190 | 7.1 | $ 1,349.00 |
| White | $115 | 0.6 | $ 69.00 |

### E. Costs

Defendants also seek an award of costs pursuant to section 42–150bb. This court has previously held that, when sitting in diversity, the award of costs is ordinarily controlled by federal law, except where an important state interest is implicated. *Bristol Tech., Inc. v. Microsoft Corp.*, 127 F.Supp.2d 64, 82–83 (D.Conn. 2000). In *Bristol Technology*, the court awarded costs pursuant to CUTPA that went beyond the taxable costs available under federal law. *Id.* The court did so in order to further "Connecticut's substantive policy of providing costs to CUTPA plaintiffs to further CUTPA's remedial purpose," after finding that this purpose was

not contravened by any federal rule or statute. *Id.*

Section 42–150bb, however, does not explicitly provide for an award of costs to the successful party. In a case in which it construed section 42–150bb, the Connecticut Supreme Court made clear that the statutory mandate for an award of costs to the prevailing party under state law is separate from an award of attorneys' fees. *See Rizzo Pool Co.,* 240 Conn. at 66–67 & n. 11, 689 A.2d 1097 (comparing the procedures applicable in obtaining an award of attorney's fees under section 42–150bb and an award of costs under Conn. Gen.Stat. § 52–257). Therefore, the court declines to award costs under Conn. Gen. Stat. § 42–150bb.

## IV. CONCLUSION

For the foregoing reasons, defendant's Motion for Attorneys' Fees (Doc. No. 177) is GRANTED. The court awards $113,306.50 in total fees.

**SO ORDERED.**